IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JOSE PINEDA-MENDOZA,

    Defendant.
_____/

No. 2:11-cr-0320 WBS (GGH)

ORDER

*Introduction and Summary*

Subpoenaed party "Original Productions" seeks an order quashing a Fed. R. Crim. P. 17(c) subpoena requiring production of:

> All video footage and outtakes filmed for "Wild Justice" which include California Department of Fish and Game Officers Aaron Galway, Brian Boyd or his dog "Phebe."

For the reasons granted herein, with the exception of one video already produced, making the motion to quash moot as to it, the motion to quash is granted.

*Background*

Defendant has been indicted for cultivation of over 1,000 marijuana plants. As is often the case, this cultivation was allegedly performed in a remote, undeveloped location near or on public forest lands. According to the initial *ex parte* subpoena request filed March 8, 2012:

1

> Fish and Game Officer Brian Boyd "Boyd") and his dog Phebe detained defendant in or near growing marijuana [sic] on National Forest Land. Boyd wrote a report which stated that he warned defendant, in English as well as Spanish, that he would send the dog after him if he ran away. Boyd also stated that he conducted an un-Mirandized, un-recorded interview of defendant in Spanish after defendant's detention in which defendant made admissions about the size of the marijuana grow near that location. Boyd also prepared a diagram, two months after defendant's detention, which supposedly depicts the layout of the marijuana grow. Boyd's credibility on these subjects will be material at trial, or at a pretrial hearing on the admissibility of defendant's alleged un-recorded statements.

Request at 3.

Evidently, Officer Boyd has a "second career" as a reality TV show star in which his activities as a law enforcement officer are televised, in part, for a TV program entitled "Wild Justice." Part of his and Galway's job activities which may have been videoed could deal with apprehension of marijuana cultivators on or near public lands. Defendants have requested production of *all* videos as set forth above, i.e., involving every aspect of the Fish and Game officers' jobs, in the belief that some of the video, whether utilized on the program or not, may "impeach" Officer Boyd or Officer Galway [in some unspecified way].

Based upon the *ex parte* application made directly to him, the Honorable William B. Shubb authorized the issuance of the Rule 17 (c) subpoena.[1] Docket # 23 (the proposed summary order which had been prepared by defense counsel). Upon service, non-party Original Productions commenced efforts to determine if it had filmed defendant's bust (no), and also determined that it had filmed two marijuana "busts." One bust video was easily locatable as it had not yet been warehoused and evidently was recollected by Original Productions personnel. This video was turned over to defense counsel. The other bust video could not be located.

However, defendant desired all video footage of Boyd and Galaway and Phebe regardless of the nature of their law enforcement activities. Efforts were made by defendant to

---

[1] Defendant's counsel should have made application before the duty magistrate judge. See E.D. Cal. Local Rule 302(b)(1). Also, the subpoena sought testimony under 17(b), but that section is not at issue in the motion to quash, and becomes moot as a result of this ruling herein.

2

give Original Productions more time to perform the required search, but:

> Original Productions further advised Defendant's counsel that while there were countless hours of footage depicting Boyd, Phebe, and their various busts, it would take weeks, hundreds of hours, and significant expense in order for Original Productions to review and produce ***all*** such footage in response to the Subpoena [referencing the Stanton Declaration].
>
> Indeed, Boyd has been featured on Wild Justice for three seasons and has appeared in thirty-one (31) episodes. Stanton Decl., para. 6. Original Productions estimates that there have been approximately 150 shooting days involving Boyd and approximately 4,000 hours of footage. *Id*. There are only four employees in the Business and Legal affairs department at Original Productions, which is responsible for responding to the Subpoena. *Id.* at para. 16. Given the various roles and responsibilities within the department, there is only one employee who would be tasked with reviewing the footage. *Id*. Even if that employee devoted eight(8) hours per day, five (5) days per week, it would take him nearly two years (i.e., 100 continuous weeks) just to review the footage. This does not include the significant time that would be required to properly address the privacy concerns of third parties who appear in the footage... nor would it include the additional time spent by Original Productions' attorneys to review problematic portions of the footage and to provide advice.

Motion to Quash at 4 (emphasis in original)

On the day of the hearing, a supplemental Stanton declaration was filed detailing how difficult it would be to even locate the footage from the not yet found "first bust."

*Discussion*

    1. <u>Whether Judge Shubb's Order on Ex Parte Applications Is Law of the Case</u>

Despite the local rules of this court (E.D. Cal. Rule 302(b)(1), which would have directed the defendant to the duty magistrate judge with respect to his initial request for subpoena, defendant made the application before the presiding judge, the Honorable William B. Shubb. Judge Shubb signed the proposed order which had been submitted by defendant, Docket # 23, which without discussion simply permitted the subpoena to be issued to Original Productions. Original Production did notice its motion to quash before the duty magistrate judge. Docket # 35. In order to ensure that Judge Shubb did not desire to withdraw the reference because the initial *ex parte* was signed by him, the undersigned contacted Judge Shubb to determine this fact. No withdrawal of the reference was made.

3

Defendant essentially asserts, however, that the ruling made by Judge Shubb is law of the case, binding upon the undersigned, and that Original Production's objections with respect to whether the requirements for a Rule 17 subpoena have been satisfied is a decided matter which cannot be litigated anew. Defendant is incorrect.

While there is no doubt that a ruling made by one judge of a court should not be reviewed by another judge of the court, absent certain exceptions, e.g., change in the law, new facts which could not have been supplied at the time of the first ruling, see Gonzalez v. United States, 624 F.3d 1162, 1186 (9th Cir. 2010), law of the case is not implicated where the original order was entered without discussion of why it was issued. Hydrick v. Hunter, 500 F.3d 878, 986 (9th Cir. 2007, vacated on other grounds, Hunter v. Hydrick, 129 S.Ct. 2431 (2009). Nor does it apply to preliminary orders or orders issued *ex parte*. Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 129 (n.8) (1st Cir. 2006) (preliminary orders); Munro v. Post, 102 F.2d 686, 688 (2nd Cir. 1939) (ex parte order); United States v. Palfrey, 530 F. Supp. 2d 343, 344 (D.D.C. 2008) (ex parte order). It is generally unfair to preclude a party from later arguing an otherwise legitimate objection when that party has not had any opportunity to initially voice the objection.

Indeed, Palfrey dealt with the issuance of a Rule 17 *ex parte* order allowing the issuance of a subpoena, and such was held not to implicate law of the case upon a later filed motion to quash.

Such an exemption from law of the case for *ex parte* orders only makes sense in the context of Rule 17. It may well be wiser, in some cases, to await any dispute about the propriety of a Rule 17 subpoena request, prior to embarking upon a full fledged resolution of an unripe objection. Moreover, it is the subpoenaed party's obligation to specify what objections it would like to make. The district court should not have to presume the nature of the objections. Finally, the notion of "undue burden" in the Rule 17 context often dovetails with the evidentiary and specificity requirements for Rule 17 subpoenas discussed below. The less likely a request is evidentiary or specific, the more likely that a request can be viewed as unduly burdensome when

the request calls for a good deal of work and expense.  The converse is true as well.

In short, Judge Shubb's issuance of an ex parte order authorizing the issuance of a Rule 17 subpoena does not preclude the undersigned from deciding any recognized, asserted objection to the issuance of a Rule 17 subpoena.

2. The Requirements for Issuance of a Rule 17 Subpoena Have Not Been Met and Compliance With the Subpoena is Unduly Burdensome

As Judge Shubb has written:

> A defendant requesting a subpoena under Rule 17(c) must demonstrate that the materials sought are both relevant and admissible, and must identify the materials to be produced with specificity. *United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Eden*, 659 F.2d 1376, 1381 (9th Cir.1981).
>
> ****
>
> A subpoena under Rule 17(c) "is not intended to serve as a discovery device, or to 'allow a blind fishing expedition seeking unknown evidence.' " *United States v. Reed*, 726 F.2d 570, 577 (9th Cir.1994) (quoting *United States v. MacKey*, 647 F.2d 898, 901 (9th Cir.1981). Yet, that is exactly how defendant seeks to use Rule 17(c). A subpoena signals a fishing expedition when it calls for "[a]ny materials" regarding a particular subject and "any other information" and defines "[m]aterial information" as "includ[ing]" but "not limited to" the described information. The requested subpoenas are so broad and unspecific that the court is also unable to determine the admissibility of the evidence sought.
>
> Rule 17(c) was designed as a method of compelling witnesses with relevant and admissible documentary evidence to bring those documents to the trial or hearing at which they will be offered in evidence. The fact that the Rule goes on to permit the court to direct the witness to produce the designated items in court before they are actually to be offered into evidence was not meant to convert Rule 17(c) into a discovery device. The discovery tools available to defendants in criminal cases are limited, and are to be found elsewhere in the Federal Rules of Criminal Procedure, not in Rule 17.

United States v. Zavada-Tapia, 2010 WL 5330506 *1 (E.D. Cal. 2010).

In addition, a request based on the premise that something valuable for impeachment of a presumed government witness *might* turn up is equally faulty.  Such was the holding of United States v. Fields, 663 F.2d 880, 881 (9th Cir. 1981): "The only evidentiary use that defendants have been able to advance is that the [sought documents] could be used for impeachment purposes.  This use is generally insufficient to justify the pretrial production of

5

documents, see [Nixon] at 701, 94 S.Ct. at 3104, and we see no basis for using a lesser evidentiary standard merely because production is sought from a third party rather than from the United States."

The only proffered evidentiary use herein for the video footage is that defendant may find something in all that video which might impeach Boyd. But impeach Boyd as to what? That specific answer is never given. Defendant proffers what Boyd did in this case (which will rise or fall on the evidence in *this* case), and then asserts an example of Boyd being somewhat of a rogue law enforcement officer in another marijuana bust case with respect to the use of Phebe and questioning a suspect. Defendant asserts there may be more examples of such conduct. But that is not impeachment; it is inadmissible character evidence, pure and simple. Moreover, defendants do not point to a specific statement or action of Boyd in this case, and with specificity, assert that a different statement or action of Boyd known to them would impeach Boyd.

For example, assume Boyd had said that he had never used his dog Phebe to hold a suspect down while he questioned the suspect. Assuming further that this statement had some relevance to the circumstances of this case, a specific request for video footage which showed him to have done this might well pass the evidentiary test. But defendant does not offer such a scenario. The request is made for *all* footage so that whatever the future brings with respect to statements or actions of Boyd, defendant *might* be able to find something which will impeach Boyd. Further assume that Boyd did not Mirandize defendant in this case, and there *might* be some footage where he did not Mirandize another suspect in the past. However, in order to find this useful for impeachment, one would have to assume that no circumstances exist which would make the non-Mirandizing in the unknown incident relevant to the circumstances of this case, e.g., was a waiver of Miranda obtained, did the suspect simply blurt out incriminating statements, did imminent safety concerns obviate the need for Miranda warnings before interrogation, and the like. Defendant's certain rejoinder – well, we won't know if the circumstances were similar

(useful) until *all* the video is produced and reviewed – is the antithesis of specificity. The rejoinder is, no more or less, a simple discovery request made on the chance that something useful will turn up.[2]

Added to the above is the burden which would be imposed on reviewing all footage to see if Boyd, Galaway (who is not mentioned at all in defendant's argument) and Phebe are viewed doing something. As set forth above, Original Production's bottom line is that it would take 100 weeks of continuous footage review by one employee to be able to produce with assurance all the requested videos. While one can theorize a better indexing system to greatly reduce the burden, apparently, such an indexing system used by Original Productions does not exist. Even with respect to producing the one, heretofore unlocatable marijuana bust in which Boyd was involved, a substantial burden in acquiring the footage is involved. While perhaps the burden argument for this one video footage could be overcome if sufficient evidentiary value had been posited, the usefulness of this unlocatable bust footage on the present record is nothing more than a crap shoot at this point.

In sum, the Rule 17 request in this case is the factual equivalent of duck hunting while blindfolded where the duck hunter (defendant) posits a remotely possible chance that a duck will be bagged if enough buckshot is fired. This scenario might not be so bad if all that were at stake was the duck hunter's own time and resources, but that is not the case. Defendant herein desires that a third party be compelled, with attendant great expense, to herd all available ducks within earshot and buckshot range. To slightly mix metaphors, and with apology to Phebe, that dog won't hunt.[3]

---

[2] Moreover, even suppose a similar circumstance video footage exists which shows that Boyd has a proclivity to not Mirandize suspects when he should. No present dispute exists to the undersigned's knowledge in this case that Boyd has said he did Mirandize defendant out in the woods on the arrest day. No need for impeachment exists for this reason alone.

[3] Of course, the use at trial of the one marijuana bust video which was located and produced is a decision for the trial judge.

*Conclusion*

Original Productions's motion to quash (Docket # 35) is granted.

DATED: September 13, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

pineda-mendoza.ord